IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 24, 2014 Session

**ANNETTE TRAN HAMBY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Bradley County**
**No. M-10-739  Carroll L. Ross, Judge**

**No. E2013-02383-CCA-R3-PC - Filed August 25, 2014**

The Petitioner, Annette Tran Hamby, appeals the Bradley County Criminal Court's denial of her petition for post-conviction relief from her 2008 conviction for first degree murder and resulting life sentence.  The Petitioner contends that the post-conviction court erred by denying her relief because she received the ineffective assistance of counsel.  Specifically, she alleges that trial counsel was ineffective for failing to request an independent mental evaluation to rebut the evaluation presented by the prosecution at trial.  After considering the record and the applicable authorities, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ROBERT W. WEDEMEYER, J., joined.

R. Wylie Richardson, Cleveland, Tennessee, for the appellant, Annette Tran Hamby.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Steven Bebb, District Attorney General; and A. Wayne Carter, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

The Petitioner appealed her first degree murder conviction, and this court affirmed the conviction and summarized the facts of the case as follows:

This case relates to the June 10, 2007, shooting death of Jerry Burris, which occurred at the hands of his cousin, the [Petitioner], at the [Petitioner]'s Bradley County home.  Bradley County Sheriff's Deputy Kristi Barton testified

at trial that she pulled into the [Petitioner]'s driveway behind Deputy Jody Musselwhite, who left his vehicle and ran to the victim. She said a man standing on the residence's porch informed her that he had put the gun away and pointed upwards. She stated that when she looked up, she saw a gun lying sideways in the porch rafters.

Deputy Barton testified that she entered the home and found the [Petitioner] sitting calmly in a chair with a cigarette in one hand and a telephone in the other. She said she instructed the [Petitioner] to hang up the phone and put out her cigarette, but the [Petitioner] instead handed the phone to her. Deputy Barton stated that she discovered her dispatcher on the other end of the line, informed him that she was on the scene, and again told the [Petitioner] to put out her cigarette. She said that as she was escorting the [Petitioner] to an ashtray, the [Petitioner] spontaneously announced, "I shot that son-of-a-bitch," and, as she was handcuffing her, protested: "I shot him. These ain't necessary. I don't need these cuffs. I'm not hiding from it. I'm not running from it. I told you I did it."

Deputy Barton testified that as she and the [Petitioner] walked past the victim, the [Petitioner] turned around and yelled to the emergency medical personnel, "Don't try to save him. He deserves to die. Don't try to save him." She said the [Petitioner] continued her spontaneous comments during the twenty-minute trip to the criminal justice center, saying, "I shot him. I shot that son-of-a-bitch; I shot him; hope he's dead." She said the [Petitioner] kept asking her if the victim was dead and when she finally replied yes, the [Petitioner] commented, "Thank the Lord."

Deputy Barton characterized the [Petitioner]'s non-stop talk during the trip to the justice center as "babbling," testifying that the [Petitioner] continually repeated that she had shot the victim, that she meant to do it, that she was thankful he was dead, and that she had shot him because he had killed her mother. She clarified, however, that the [Petitioner]'s speech was not slurred and that her words made sense in the context in which they were uttered. She said that she could smell alcohol on the [Petitioner]'s breath but that the [Petitioner] was able to stand, walk, and put out her cigarette in a normal fashion, neither staggering nor fumbling in her actions.

Deputy Barton testified that as she and the [Petitioner] were walking into the justice center, the [Petitioner] told her that she would "get off" because she had been to Moccasin Bend Mental Health Institute and could

-2-

prove she was crazy. She stated that she was present during Detective Hernandez's interview with the [Petitioner] and that the [Petitioner] said in the interview that her father would be next and that she should have shot him first. On cross-examination, Deputy Barton acknowledged that the [Petitioner] made no attempts to flee or hide, commented after learning the victim was dead that her mother could now rest in peace, told the officers that her father had beaten both her mother and herself, and expressed anger toward the victim.

Linda Ballew, a paramedic with Bradley County Ambulance Service, testified that the victim was already dead when she arrived. She stated as she began her evaluation of the victim, the [Petitioner], who was being escorted to a patrol car, announced that she had killed the victim and that he had killed her mother. According to Ballew, the [Petitioner] used an obscenity to refer to the victim, spoke clearly, and exhibited no difficulty walking. On cross-examination, she agreed that the [Petitioner] appeared angry.

Detective Scotty Hernandez of the Bradley County Sheriff's Department testified that he interviewed the [Petitioner] at the justice center on June 10, 2007. He stated that the [Petitioner] told him that the victim had harmed her mother years ago and had to pay. The [Petitioner] then related the following: that she planned to shoot the victim when he returned from a trip to the lake with the [Petitioner]'s husband; that she retrieved a gun from the residence when she saw the victim walking up the driveway; that she went outside and waited until the victim got closer; that she closed the distance in order not to miss; that she said to the victim, "You killed my mother and now I'm going to kill you, you son-of-a-bitch"; and that she then shot the victim. Detective Hernandez testified that the [Petitioner] told him that after the victim was on the ground, she walked back into the house and called 9-1-1.

On cross-examination, Detective Hernandez acknowledged that the [Petitioner] expressed anger toward both the victim and her father during the interview. He also acknowledged the [Petitioner] related an incident that occurred several years earlier in which the victim had struck the [Petitioner]'s mother in the head. He said the [Petitioner] also told him that her father had abused both her mother and herself. He stated that he did not perform a blood-alcohol concentration test on the [Petitioner] because he did not think it necessary, testifying that although he could smell that the [Petitioner] had been drinking, "she was able to speak clearly, walk under her own power, perform motor skills, write her name, remember dates, remember times."

Tennessee Bureau of Investigation (TBI) Special Agent Forensic Scientist Laura Hodge testified that elements of gunshot residue were present on the [Petitioner]. TBI Special Agent Forensic Scientist Shelly Betts, an expert in firearms identification, testified that the weapon involved in the case was a Ruger, single-action, .44 Magnum revolver. She said that in order to fire a single-action revolver, one has "to first manually cock or thumb back the hammer" before squeezing the trigger.

Ross McNabb, the [Petitioner]'s father, testified in the [Petitioner]'s behalf. He said that approximately twelve years earlier, the victim threw a concrete duck at him after becoming angry at something he said. He said the duck missed him but struck his wife, the [Petitioner]'s mother, in the head. He testified that his wife was in a coma for approximately two weeks after the incident, remained hospitalized for four months, and sustained permanent brain damage as a result of the injury. He said that during the two years that elapsed before her death, the [Petitioner] helped him care for her by giving her baths and attending to her personal grooming. He stated that, in his opinion, the victim was responsible for his wife's death.

Robert Wayne Hamby, the [Petitioner]'s husband, testified that on the day of the shooting, he was outside on the swing and had cleaned and reloaded his revolver, when he saw the victim approaching the house with the victim's girlfriend, Colleen Bryant. He said he hid the gun in the cushion because the victim was a thief. He stated that the victim asked to borrow his car dolly and he refused but that the victim kept hanging around the house. He testified that he finally asked the victim to accompany him on his boat because he knew that the [Petitioner] did not like the victim and he wanted to get the victim away from the house.

Hamby testified that he and the victim returned home approximately two hours later. He said he had dropped the victim at the end of the drive and was in the process of backing up his boat when he heard a crack, got out to see if he had run over anything, and then saw Bryant running up the road yelling that the [Petitioner] had just shot the victim. He stated that he ran to the house to find the victim lying on his back and the [Petitioner] inside calling 9-1-1. He described the [Petitioner] as having the look of a wounded animal and said that she was running in circles and "babbling" that she had shot the victim and was glad but that she had not meant to shoot him.

Hamby testified that the [Petitioner] was an alcoholic and regularly took

-4-

the mood stabilization drug, Seroquel. He said she had been "drinking some" before the victim and his girlfriend arrived at the house but was not drunk. He testified that he had seen the [Petitioner] intoxicated numerous times in the past and that when she was drunk, she frequently talked of her childhood and wept for her mother. He stated that the [Petitioner] received disability benefits for mental issues, was "not the brightest bulb in the pack," and sometimes exercised poor judgment. However, in his opinion, she was not "crazy."

Hamby further testified that he found a prescription bottle of Oxycontin on the porch after the shooting. He said that he took the bottle to the sheriff's department but that officers told him it was not relevant to their investigation. He claimed, however, that Bryant was an Oxycontin addict and had been seen by the [Petitioner]'s brother putting Oxycontin in the [Petitioner]'s beer. On cross-examination, Hamby repeated that the [Petitioner] was not drunk at the time of the shooting.

Alvin McNabb, the [Petitioner]'s brother, testified that the [Petitioner] began drinking at approximately 9:30 a.m. on the day of the shooting. He stated that the victim and Bryant came to the [Petitioner]'s house at approximately 3:00 p.m. and that Hamby purchased the [Petitioner] an additional twelve-pack of beer before leaving for the lake with the victim. McNabb said that he left the [Petitioner]'s house at about 5:30 p.m., before the shooting occurred. He testified that the [Petitioner] blamed the victim for her mother's death and became upset about her mother whenever she drank alcohol.

The forty-six-year-old [Petitioner] testified that she was disabled with bipolar disorder and schizophrenia, for which she had been prescribed Seroquel and Citalopram. She stated that she woke in a foul mood on the day of the shooting, drank heavily all day, and remained irritated and upset throughout the day. She said she was angry that her brother brought Bryant and the victim to her house and explained that she and the victim had been close before the 1995 incident with her mother but that she did not like him afterward. She also claimed that the victim was trying to get her hooked on methamphetamine and that his girlfriend kept "popping" hydrocodone pills and offering them to her. She could not, however, remember if she had taken any hydrocodone on the day of the shooting. She said that her anger toward the victim had been building for a long time but that she had not planned to shoot him and had not known that the gun was on the swing until she sat on top of it. Finally, she stated that she was just "fed up with everything" at the

time she fired the shot. On cross-examination, she acknowledged having told her husband in a telephone conversation after her arrest that she was going to tell the police she could not remember what had happened.

Dr. Troy Gilson, a psychiatrist who conducted a forensic evaluation of the [Petitioner], testified as a rebuttal witness for the State that he had determined the [Petitioner] to be competent to stand trial and that an insanity defense could not be supported. He further testified that the [Petitioner] had been diagnosed in the past with bipolar "NOS" and alcohol and cannabis dependence, but there was no record of her having ever been diagnosed with schizophrenia. On cross-examination, he conceded that individuals with bipolar disorder can sometimes exhibit impaired judgment.

Detective Scotty Hernandez, recalled as a rebuttal witness by the State, testified that one to two days after the shooting, Hamby brought him an Oxycontin bottle that he wanted collected as evidence. He said that he refused to do so because, to his knowledge, there had not been any prescription pill bottles at the scene of the shooting. Detective Hernandez also identified the audio recording of the [Petitioner]'s telephone conversation with her husband, which was subsequently admitted as an exhibit. In the conversation, the [Petitioner] stated that she hated the victim, planned to plead not guilty by reason of insanity, and was going to tell the police that she could not remember what had happened.

State v. Annette Hamby aka Annette Tran McNabb, No. E2008-02030-CCA-R3-CD, 2009 WL 4282040, at *1-5 (Tenn. Crim. App. Dec. 1, 2009), perm. app. denied, (Tenn. Apr. 14. 2010).

The Petitioner filed a petition for post-conviction relief contending, in relevant part, that she received the ineffective assistance of counsel. She argued counsel provided ineffective assistance by failing to request an independent mental health expert to evaluate her mental condition at the time of the offense and by failing to raise on appeal the trial court's prohibiting her from presenting a diminished capacity defense.

At the post-conviction hearing, the Petitioner testified that she met with counsel two or three times before the trial. She said that they discussed her mental illness and the treatment she received before the date of the offense. She said that she first began mental health treatment at age twenty for bipolar and manic depressive disorder and that she was fifty-two at the time of the post-conviction hearing. She received Seroquel, which she called sleep medication, and participated in an outpatient treatment program. She was also

hospitalized before the offenses at Pine Ridge Treatment Center for alcoholism but did not recall the dates. She was hospitalized twenty years previously for about one month at Mocassin Bend Mental Health for manic depressive disorder. She was previously hospitalized for alcoholism and substance abuse, but she did not recall the name of the facility.

The Petitioner testified that her treating physician was Dr. Troy Gilson and that he continued to treat her until the offense occurred. She agreed that Dr. Gilson was employed at Hiwassee Mental Health and that she saw Dr. Gilson once a month on an outpatient basis at the time of her arrest. She said she told counsel about her lengthy mental health history and that Dr. Gilson was her treating physician.

The Petitioner testified that on September 26, 2009, after she was convicted and sentenced, a brain aneurysm ruptured requiring surgery. She said she had five additional surgeries, which were to insert and extract plates in her skull and to extract a staph infection. She said she thought the aneurysm might have affected her mental capability during the trial because a surgeon told her that the aneurysm had probably been there her entire life. She said her new health issues had resulted in paralysis on her left side and had affected her speech. The post-conviction court noted the Petitioner's difficulty speaking.

On cross-examination, the Petitioner testified that she recalled meeting with the Hiwassee Mental Health team before the trial but that she did not recall talking to the doctors about whether she understood what was happening and what a trial was. She said she lost most of her memory after her last brain surgery but moments later said she lost her memory after her first brain surgery in 2009.

The mental evaluation report reflects that the Petitioner was evaluated by Dr. Troy Gilson and Todd W. Wiggins, M.A., Senior Psychological Examiner. The Petitioner showed no "unusual motor movements or behaviors" and denied having hallucinations at the time of the interview. She reported occasionally hearing a radio playing in the background but denied having other auditory hallucinations. The Petitioner showed no evidence of delusions and stated she was able to communicate her thoughts. Although she reported difficulty with memory, she said she was not "stupid." The report showed she had "fair judgment" regarding her situation and the future.

The report showed that the Petitioner understood the basic concepts about the court proceedings, that she had been involved in the court system previously, that she understood the charge against her and the possible sentence if convicted, that she had the capacity to discuss the facts of the case with her attorney, and that she understood the functions of the various actors in the courtroom. The Petitioner reported that on the day of the shooting, she

drank alcohol and took pain medication, which clouded her memory. She denied "experiencing significant problems or symptoms related to mental illness" at the time of the shooting. The report concluded that the Petitioner's thought processes were rational prior to and after the shooting, that she was capable of appreciating the wrongfulness of her actions, and that no evidence showed a psychotic thought process affected her ability to reason at the time of the shooting. Although the report stated that the use of alcohol and pain medication "could have impaired her judgment," it noted that her actions were not influenced by mental illness and that no mental condition substantially impaired her capacity to appreciate the wrongfulness of the alleged crime.

The Petitioner testified that she recalled speaking with Dr. Gilson and Todd Wiggins in 2007 and that she was found competent to stand trial. She agreed she knew what was happening and that an insanity defense was not supported at that time. She also agreed Dr. Gilson concluded that she was competent to stand trial. She further agreed the mental health evaluation showed that she told the doctors she had difficulty with her memory at times but was not stupid, but she did not recall saying it.

The Petitioner testified that she took the medication Dr. Gilson prescribed, although she drank alcohol when she was told not to drink alcohol. She denied taking another person's pain medication. She agreed that two of her hospitalizations were for alcoholism, not bipolar disorder. She did not recall Dr. Gilson testifying at the trial that her previous bipolar diagnosis did not make her insane, but she did not dispute the accuracy of the trial transcript. She did not recall Dr. Gilson testifying that her bipolar disorder was complicated by her alcoholism and substance abuse, although she admitted alcohol abuse caused problems. She agreed she did not have delusions or psychotic episodes at the time of the offense.

The Petitioner testified that she was able to communicate with counsel in preparing for the trial, but she did not recall testifying. She denied telling people that she would be acquitted because she was "crazy." She denied testifying at the trial that she waited to shoot the victim until he was close to her so she would not miss. She agreed, though, that she told the paramedics to "just let the S.O.B. die." She did not recall shooting the victim, telling the 9-1-1 dispatcher that she had killed the victim, and telling Detective Scotty Hernandez that she had waited a long time to kill the victim.

The Petitioner testified that she told counsel she was receiving treatment at Hiwassee Mental Health. She denied knowing that in February 2008, counsel filed a notice of expert testimony regarding her mental condition and knowing counsel planned to call Dr. Gilson as a potential witness. The notice was received as an exhibit. She agreed the notice showed

-8-

that counsel knew she was receiving treatment at Hiwassee Mental Health and that she was undergoing an evaluation.

Andrew Freiberg, an expert in the practice of criminal law, testified that he previously spoke with the Petitioner, co-counsel, and counsel and reviewed the trial transcript. He said he conducted his own research and spoke with psychologist Tom Beeler, psychiatrist Robert Stetson, and psychiatrist Niansen Liu. He said that after reviewing the relevant materials, he concluded that the Petitioner's case was going to be difficult for any defense attorney because of the proof against her. He said, though, it was "unusual" that Dr. Gilson was the Petitioner's treating physician and the forensic physician who found her competent to stand trial.

Mr. Freiberg testified that, although Dr. Gilson performed the mental health evaluation, counsel did not request that a second physician perform an evaluation. He said he viewed Dr. Gilson's evaluation as an "inherent conflict" because he had an incentive to conclude his patient was competent and sane. He said any other conclusion would have reflected poorly upon Dr. Gilson's treatment. He said the American Psychiatric Association Ethical Guidelines discussed this dual role and advised that it might be a violation of the doctor-patient privilege for a physician to use information "in what could amount to . . . adversarial testimony" against a patient.

Mr. Freiberg testified that although psychiatrists are helpful in determining competency, they are also helpful in presenting a diminished capacity defense. He noted that counsel told the trial court that the issue was the Petitioner's intent and state of mind, not the identity of the killer. He said that although "not much of a defense" was presented, he thought a diminished capacity or intent defense-type case would have been applicable because of the Petitioner's mental health. He noted that counsel filed a motion regarding diminished capacity on March 3, 2008, the day before the trial, and that counsel admitted the motion was filed late. He said the motion was denied by the trial court. He said counsel stated that in hindsight, he should have sought an independent mental health evaluation. He agreed, though, that the defense would have been prevented from presenting a diminished capacity defense if the results of an independent mental health evaluation were identical to Dr. Gilson's evaluation.

Mr. Freiberg testified that the issue of diminished capacity was of such importance that the trial court's denial of counsel's motion to present expert testimony regarding the Petitioner's mental condition should have been raised on appeal. He said the trial court's denial of the motion "would have affected" trial preparation, jury selection, opening statements, and questioning of the State's witnesses.

On cross-examination, Mr. Freiberg testified that although he found it troubling that Dr. Gilson performed the forensic evaluation, he had no legal authority showing Dr. Gilson was prevented from acting in a dual capacity. He agreed that the Petitioner's mental health evaluation was a team effort and that each physician agreed with the conclusion. He agreed the Petitioner had a significant alcohol problem but denied knowing she was non-compliant with her treatment.

Mr. Freiberg testified that the Petitioner's pretrial telephone call to a family member stating, "Don't worry about this, honey. . . . We're gonna get an insanity defense," made any intent argument difficult. He recalled that long-term tension existed between the victim and the Petitioner because of the victim's treatment of the Petitioner's mother. He agreed no evidence in the record showed she was incoherent or did not understand what she was doing on the day of the offense. He agreed that the outcome of any independent evaluation and whether a diminished capacity defense would have been viable was based on speculation. He said his focus was on counsel's failure to request an independent evaluation. He agreed counsel would have been required to show a particularized need for an evaluation.

Co-counsel testified that he had worked for the Public Defender since 2007. He said he visited with the Petitioner numerous times, assisted counsel during trial preparation, questioned some of the trial witnesses, and worked on the appeal. Regarding the Petitioner's mental health, he said they obtained a copy of her medical records from Hiwassee Mental Health and reviewed those records with the Petitioner. He said counsel took the lead on how to handle the records.

Co-counsel testified that he wrote the appellate brief and that he discussed with counsel which issues to raise. He recalled the motion hearing shortly before the trial regarding expert testimony on the Petitioner's state of mind and said the major issues surrounding the defense were her state of mind at the time of the shooting and her drug and alcohol abuse. He agreed the trial court's denying the motion was not raised as an issue on appeal and said no case law existed at the time to warrant raising the issue. He said he and counsel probably discussed raising the issue but did not know for sure because of the passage of time. He said, though, that the Petitioner's state of mind was covered in the other issues raised on appeal.

On cross-examination, co-counsel testified that he met with the Petitioner alone several times, although he did not recall the specific number of meetings. He recalled reviewing the Petitioner's medical records with her and said she was coherent and able to provide details about "each event" in her records. Many of the events involved her alcohol use. He agreed the Petitioner was non-compliant in taking her medication and self-medicated with alcohol. He agreed the Petitioner made several statements about killing the victim that

showed premeditation. He, counsel, and the Petitioner talked at length about the case, whether she would testify, and the substance of her possible testimony. He recalled discussing with the Petitioner her conversation with Mr. Hamby in which she said she would plead not guilty by reason of insanity.

Counsel testified that he had worked for the District Public Defender's Office since 1989 and had been the District Public Defender since 2005. His representation began in the general sessions court, and the general sessions judge ordered a mental health evaluation, which was normal practice. He knew of her mental health history, which was the reason he requested the evaluation. He never doubted the Petitioner's competency, which was confirmed by the evaluation report from Hiwassee Mental Health. He stated that the Petitioner's mental condition at the time of the shooting was important to the case but that the Petitioner felt justified in killing the victim. He said that evidence existed showing the victim seriously injured the Petitioner's mother years before the killing and that the Petitioner had "strong feelings" about the victim. He said the victim's injuring the Petitioner's mother provided a motive to kill the victim, but he wanted to use the evidence to show that the Defendant formed the idea to kill the victim when she saw him. He wanted to show the jury that seeing the victim revived memories of his injuring her mother and that she was incapable of premeditation.

Counsel testified regarding the Petitioner's mental health that his strategy was to show she could not "cooly deliberate" because seeing the victim triggered a traumatic event and feelings of anger. He also wanted to present evidence of the effect alcohol had on the Petitioner, but the officers at the scene testified that the Petitioner was not intoxicated. He said, though, he argued the Petitioner was intoxicated because she was an alcoholic who drank daily. He said no one who was around the Petitioner on the day of the shooting could testify that the Petitioner had a psychotic episode. He concluded the motivation was her anger toward the victim for injuring her mother and her being under the influence of alcohol. He noted the Petitioner had no remorse for killing the victim and had a "reasonably good recollection" of the events. He said the Petitioner was able to tell him what she did that day and why she did it. He said that the injury to the Petitioner's mother was not contemporaneous to the shooting and that the victim was unarmed and helping the Petitioner's husband move a boat.

Counsel testified that the prosecutors told him a few weeks before the trial that they were going to call Dr. Gilson, although he did not understand why because it permitted him to cross-examine Dr. Gilson about the Petitioner's mental health history. He said that although the State wanted Dr. Gilson to testify that the Petitioner was competent, sane, and not acting under a diminished capacity, counsel was able to present evidence of her mental

health and alcohol abuse. He noted Dr. Gilson testified that the Petitioner's substance abuse could have impaired her judgment at the time of the shooting.

Counsel testified that his late filing of the motion to present expert testimony of her mental health was a precaution and that the case law was against him regarding diminished capacity. He said they did not appeal the trial court's denying the motion because the case law supported the court's ruling. He said that an expert must testify that the person could not form the required intent to permit evidence of diminished capacity and that Dr. Gilson was not going to testify accordingly. He agreed the Defendant's mental condition at the time of the shooting was critical to the defense.

Counsel testified that he did not believe an inherent conflict of interest existed by Dr. Gilson's performing the forensic mental health evaluation. He said the Petitioner's previous treatment was voluntary and whether she was compliant with her treatment plan and medication would not have been Dr. Gilson's fault. He admitted he could have filed an ex parte motion for funds for an independent mental health expert but said his trial strategy was to show that the injury to the Petitioner's mother and the Petitioner's consumption of alcohol prevented her ability to premeditate. He said no evidence showed the Petitioner was delusional or had a break with reality. He did not deny her mental illness might have been a contributing factor, but he did not believe her mental health prevented her from appreciating the wrongfulness of her conduct.

On cross-examination, counsel testified that he did not believe it was appropriate for him to request ex parte funds for an additional mental health expert because he did not believe the facts supported an insanity or diminished capacity defense. He agreed the State called Dr. Gilson as a rebuttal witness after the Petitioner testified about her mental health issues. He agreed that he concluded that the Petitioner's conduct was not the result of mental illness and that the facts did not support a diminished capacity defense.

Counsel testified that he met with the Petitioner several times and that from the beginning of his representation, the Petitioner felt she was justified in killing the victim. He said he was not able to persuade the Petitioner to understand that a jury might not think she was justified in killing him.

The post-conviction court denied relief. It found that before the trial, the Petitioner's mental health was evaluated by Dr. Gilson, who had been the Petitioner's treating physician for many years. Dr. Gilson and Mr. Wiggins jointly concluded that the Petitioner was competent to stand trial and that an insanity defense was not supported in this case. It noted they did not conclude that she had a mental defect affecting her ability to appreciate the wrongfulness of her actions. Regarding counsel's failure to obtain an independent expert,

the court found that the Petitioner admitted being mad at the victim because he injured her mother and that her hatred for him increased over time. It found that the Petitioner was "very much in control of her actions" on the day of the killing. The court noted the Petitioner's telling the police officers at the scene that she shot the victim and that the victim killed her mother. It also noted she told the investigating officer that she "didn't just shoot him. [She] waited until he walked up close[.]" The court found that the Petitioner's statements showed a hatred and bitter resentment toward the victim and that her shooting the victim was calculated and premeditated. The court found that the Petitioner presented only speculation that another expert witness would have arrived at different conclusions regarding her competency and diminished capacity.

Regarding counsel's failure to raise diminished capacity on appeal, the post-conviction court found that counsel concluded that the law and the evidence did not support a diminished capacity defense and that counsel's conclusion was based on the Petitioner's statements regarding her hatred for the victim and the Petitioner's statements immediately following the shooting that she shot the victim and hoped he died. The court found that the Petitioner's actions immediately following the shooting showed she knew what she was doing and that the jury could have found she was capable of possessing the requisite mental state to premeditate the intentional killing of the victim. The court found that the Petitioner failed to show that counsel was ineffective by not raising the issue of diminished capacity on appeal. This appeal followed.

## ANALYSIS

The Petitioner contends that the post-conviction court erred by denying relief because he received the ineffective assistance of counsel. She argues counsel provided ineffective assistance by failing to obtain an independent mental health expert to evaluate her and by failing to raise the trial court's denial of a diminished capacity defense on appeal. The State responds that the post-conviction court properly denied relief. We agree with the State.

Petitions for post-conviction relief are governed by the Post-Conviction Procedure Act. Tenn. Code Ann. §§ 40-30-101 to -122. To obtain relief, the petitioner must show that his conviction or sentence is void or voidable because of the abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The petitioner must prove his factual allegations supporting the grounds for relief contained in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(2)(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is clear and convincing when there is no substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

-13-

The post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. See Nichols v. State, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)); see also Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). The petitioner has the burden of establishing that the evidence preponderates against the post-conviction court's findings. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). This court may not re-weigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Furthermore, the credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the post-conviction court. Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

Ineffective assistance of counsel claims are regarded as mixed questions of law and fact. State v. Honeycutt, 54 S.W.3d 762, 766-67 (Tenn. 2001). Thus, the post-conviction court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a de novo standard, accompanied with a presumption that the findings are correct unless the preponderance of the evidence is otherwise. Fields, 40 S.W.3d at 458 (citing Tenn. R. App. P. 13(d)). The post-conviction court's conclusions of law are reviewed under a de novo standard with no presumption of correctness. Id.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockart v. Fretwell, 506 U.S. 364, 368-72 (1993). A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley, 960 S.W.2d at 580. The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation was deficient, thus fell below an objective standard of reasonableness or was "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability means a probability sufficient to undermine confidence in the outcome." Id. Failure to satisfy either prong results in the denial of relief. Id. at 697, 700. The Strickland standard has also been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland, 466 U.S. at 687; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). In reviewing

counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Regarding counsel's failure to obtain an independent mental health expert, the record reflects Dr. Gilson concluded that the Petitioner was competent to stand trial and that an insanity defense was not supported in this case. Dr. Gilson's report stated that the Petitioner denied "experiencing significant problems or symptoms related to mental illness" at the time of the shooting, that her thought processes were rational prior to and after the shooting, that she was capable of appreciating the wrongfulness of her actions, and that no evidence existed of a psychotic thought process affecting her ability to reason at the time of the shooting. Dr. Gilson concluded that the Petitioner's actions on the day of the killing were not influenced by mental illness and that no mental condition substantially impaired her capacity to appreciate the wrongfulness of her actions.

At the post-conviction hearing, the Petitioner agreed that she did not experience delusions or psychotic episodes at the time of the shooting and that she told the paramedics to "just let the S.O.B. die." The Petitioner made numerous statements after the shooting indicating she understood the wrongfulness of her actions but expected to receive the benefit of an insanity defense based on her previous mental health history. The Petitioner said she was able to communicate with counsel in preparing for the trial. Counsel knew of the Petitioner's mental health history and requested a mental health evaluation when the case was in the general sessions court. Counsel, though, never doubted the Petitioner's competency because the Petitioner always claimed the shooting was justified based on the victim's injuring her mother years previously. Counsel used this evidence to show that the Petitioner's seeing the victim revived memories of his injuring her mother and that she was incapable of premeditation. Although counsel filed a notice to present expert medical testimony regarding the Petitioner's mental state, no witnesses who were around the Petitioner on the day of the shooting could testify that the Petitioner suffered a psychotic episode or break with reality at the time of the shooting. Counsel concluded that her motivation was anger and her drinking alcohol. Counsel recalled that the Petitioner had no remorse for killing the victim, that she had a good recollection of the events, and that she was able to state what she did and why. We conclude counsel did not perform deficiently by failing to obtain an independent mental health evaluation.

Although the Petitioner argues an independent mental health evaluation would have affected the outcome of the trial, she failed to present any supporting evidence. The Petitioner failed to present any mental health professional who disagreed with Dr. Gilson's conclusions. See State v. Black, 794 S.W.3d 752, 757 (Tenn. Crim. App. 1990) (concluding a petitioner is not entitled to post-conviction relief for counsel's failure to present a witness "unless [s]he can produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of [her] defense"). We also note that no authority exists to allow funds for experts in non-capital post-conviction cases.

Although the Petitioner presented Mr. Freiberg's testimony that Dr. Gilson's dual role as her treating physician and the physician who performed the forensic mental health evaluation presented a possible conflict of interest, nothing in the record suggests Dr. Gilson violated any laws or ethical obligations. In any event, Mr. Freiberg's testimony did not negate the Petitioner's obligation to present evidence showing an independent mental health professional would have reached a conclusion that supported an insanity or diminished capacity defense. We note that Mr. Freiberg agreed that the outcome of any independent evaluation and whether a diminished capacity defense would have been viable was based on speculation. The record does not preponderate against the post-conviction court's findings. The Petitioner is not entitled to relief on this basis.

Regarding counsel's failure to raise on appeal the trial court's excluding expert testimony regarding the Petitioner's mental state at the time of the shooting, the Petitioner conceded in her appellate brief that the trial court's ruling was supported by the facts because no expert witness was available to testify that the Petitioner was unable to form the required intent to support a diminished capacity defense. This issue is without merit.

CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-16-